# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
Filed October 7, 2016

```
* * * * * * * * * * * * * * * * * *
MARK V. DAVIS,                     *
                                   *
              Petitioner,          *       Ruling on Date of Onset
                                   *
     v.                            *       No. 16-276v
                                   *
SECRETARY OF                       *       Special Master Gowen
HEALTH AND HUMAN SERVICES,         *
                                   *
              Respondent.          *
* * * * * * * * * * * * * * * * * *
```

Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for petitioner.
Claudia Barnes Gangi, United States Department of Justice, Washington, DC, for respondent.

## RULING ON DATE OF ONSET

On February 26, 2016, Mark V. Davis, D.M.D. ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 – 34 (2006)[1] (the "Vaccine Act" or "the Program"). Petitioner alleged that as a result of receiving a Tetanus-Diphtheria ("Td") vaccination on September 20, 2013, he suffered injuries including Parsonage-Turner Syndrome. On September 8, 2016, respondent asked the undersigned to "issue a finding of fact" to ensure that the parties' experts "rely on the same set of facts in reaching their opinions." I scheduled a status conference for October 8, 2016, to discuss whether the respondent was requesting that the "finding of fact" should be made after a hearing or on the record as submitted. During the status conference, respondent requested a ruling on the record. Petitioner did not object. I stated that based on my review of the medical records and affidavits, onset was on or about October 2, 2013. My reasoning is set forth below.

   I.   **Procedural History**

Petitioner filed his claim on February 26, 2016. He filed various medical records via compact disc on April 6, 2016. He filed an expert report and several medical articles prepared by Dr. Joseph H. Feinberg on August 25, 2016. I then directed respondent to file an expert report and a Rule 4(c) report in response. On September 8, 2016, respondent filed an unopposed Motion for a Finding of Fact Regarding Onset. Respondent stated that "it is critical that the experts rely on the same set of facts in reaching their opinions" and therefore requested that I "issue a finding of

---

[1] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2006).

fact regarding" onset.  On September 22, 2016, I scheduled a status conference to discuss whether this "finding of fact" should be made on the record or following a hearing.  On October 3, 2016, petitioner filed a response to respondent's motion for a finding of fact regarding onset, arguing that onset occurred in early October.2013.  On October 4, 2016, I held the status conference to discuss the format for my finding of fact.

## II. Standard for Finding Facts

The Vaccine Act provides that a petitioner may establish causation in one of two ways. See Munn v. Sec'y of Health & Human Servs., 970 F.2d 863, 865 (Fed. Cir. 1992).  First, he may demonstrate (i) that the injury suffered is one listed in the Vaccine Injury Table ("Table Injury"), see 42 U.S.C. § 300aa-14(a); (ii) that the injury occurred within the time provided within the Table; and (iii) that the injury meets the requirements of section 300aa-14(a).  Munn, 970 F.2d at 865.  In such a case, causation is presumed.[2]  Alternatively, where the petitioner's alleged injury is not listed in the Vaccine Injury Table, ("off-Table Injury"), he must prove causation in fact.  See 42 U.S.C. §§ 300aa-13(a)(1), -11(c)(1)(C)(ii)(l).  In such a case, the petitioner must prove by a preponderance of the evidence that the vaccine at issue caused the injury.  See Shyface v. Sec'y of Health & Human Servs., 165 Fed. 1344, 1352-53 (Fed. Cir. 1999); Munn, 970 F.2d at 865.

The Vaccine Injury Table provides that compensation may be available to a petitioner who receives a vaccine containing tetanus toxoid, such as Td, and experiences an onset of brachial neuritis within 2-28 days.  In this case, it is undisputed that petitioner received the Td vaccine on September 20, 2013.  He has subsequently been diagnosed with Parsonage-Turner Syndrome, a form of brachial neuritis.  Therefore, to establish a Table Injury, petitioner must prove that he experienced his first symptoms sometime before October 18, 2013.

Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof.  Section 13(1)(a).  A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence."  Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2; see also Snowbank Enter. v. United States, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard).

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master must consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A).  Medical records that are created contemporaneously with the events they describe are generally presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems). Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993). In many past Vaccine Program cases, special masters have given substantial weight to medical records that are clear,

---

[2] In such a case, the petitioner is entitled to compensation, as long as "there is not a preponderance of the evidence that the ... injury ... is due to factors unrelated to the administration of the vaccine ...."  42 U.S.C. § 300aa-13(a)(1).

consistent, and complete.  See, e.g., Lowrie v. Sec'y of Health & Human Servs., No. 03-1585v, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  However, the presumption that contemporaneously-created medical records are accurate and complete is rebuttable.  The special master may consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony.  The Court of Federal Claims has identified four such explanations.  Inconsistencies can be explained by: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist.  La Londe v. Sec'y of Health & Human Servs., 110 Fed. Cl. 184, 203 (Fed. Cl. 2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014).  When medical records do not appear accurate and complete, the special master may give greater weight to later oral testimony.  To overcome the presumption that written records are accurate, testimony is required to be "consistent, clear, cogent, and compelling."  Blutstein v. Sec'y of Health & Human Servs., No. 90-2808v, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998).  These criteria are considered in the analysis below.

Finally, it is within a special master's discretion to determine whether, in deciding a case, a hearing is required or rather if the matter can be resolved without live testimony, based solely on the paper filings.  Vaccine Rule 8(d).  Here, respondent requested the "finding of fact" and stated at the status conference that a hearing was unnecessary.  Petitioner did not object.  Therefore, I am resolving this issue based on the record.

### III.  Summary of Evidence

The submitted evidence is summarized below in two sections: petitioner's relevant medical records followed by the affidavits he filed.

#### a.  Medical Records

On September 20, 2013, petitioner went to Dr. Thomas Austin for his annual physical.  Ex. 1, p 14-16.  At that time, he was experiencing neck and lower back pain, sleep apnea, and high blood pressure.  Id. at 15.  During his physical, petitioner received a tetanus-diphtheria vaccine on his right deltoid.  Id.

The next medical records filed are from November 22, 2013.  Early that morning, petitioner went to the Bardmoor Emergency Center of Morton Plant Hospital.  On November 22 at 3:53 a.m., the triage nurse recorded petitioner's chief complaint as "right sided chest pain with high b/p right hand numbness. Has been going on for day and half."  Ex. 19, p. 10.  The triage nurse also noted that petitioner had cervical disc disease.  Id.

A record from 4:34 a.m., electronically signed by Dr. Joshua Kaplan, states: "The patient presents with chest pain and the patient is presenting with a couple days of right-sided shoulder pain now progressing across the right side of his chest to his sternum and the pain is going down his right arm into his hand. The patient states that he has history of herniated disc in his cervical region, states that this may be radiculopathy however states that today this felt different and he

3

was concerned for his heart." Ex. 19, p. 15. It is noted that petitioner was "chest pain-free" by that time, and his initial cardiac enzymes and ECG were normal, but he would be "admitted to the hospital for a cardiac rule out." The diagnosis was chest pain. Id. at 17.

At 9:57 a.m., Dr. Thomas Austin noted that petitioner "has been having some problems in through the neck and with pain radiating down the right upper extremity, but yesterday, last night, the pain moved over into the right side of his chest as well; it was a more constant pain, described as 4/10 in intensity, and he just became alarmed that it might have been the heart, so he went to the emergency room." Ex. 19, p. 1. This record also states that petitioner "has been well except for neck pain and sciatica pain, as well." Id. Dr. Austin stated that he would "rule out heart," but that the chest pain "sounds like this is more of a radicular syndrome from his cervical neck arthritis." Id. at 2. Dr. Austin did not set forth a plan or possible diagnosis for petitioner's hand and arm pain. Id.

Records from a cardiology consultation later that same morning, November 22, 2013, indicate that petitioner "presents with chest pain. For the last 2 days he has had right arm discomfort with numbness extending into his first 2 fingers on his right hand." Id. at 3. This record similarly does not focus on or attempt to diagnose the hand and arm symptoms. Id.

On December 2, 2013, petitioner had a follow-up appointment with Dr. Austin, who recorded "weakness right hand and arm." Ex. 1, p. 12. Dr. Austin ordered an MRI, which was performed on December 4, 2013. The clinical indication given was "brachial neuritis or radiculitis not otherwise specified." Ex. 27, p. 26. On December 6, 2013, petitioner went to Dr. Michael Hadley (the son of petitioner's patient, Ron Hadley). Ex. 6, p. 1. Dr. Hadley wrote that petitioner "recently" went to the hospital and that "two weeks ago, he had onset of numbness and weakness in his hands." Id. Dr. Hadley recommended physical therapy and visiting an orthopedist, Dr. Byron Davidson. On December 13, 2013. Dr. Hadley examined petitioner again, and observed many of the same symptoms but possibly slightly weaker grip strength. Ex. 6, p. 3. Dr. Hadley noted that petitioner's occupation as a dentist, specifically the hand positioning required to examine patients, may have been aggravating petitioner's condition. Id. Dr. Hadley recommended that petitioner "discontinue[e] his job." Id. They again discussed physical therapy, consulting the orthopedist Dr. Davidson, and using cervical traction in the meantime. Id. On December 19, 2013, petitioner was seen by Dr. Davidson, the orthopedist. Ex. 21, p. 1. Medical records from this visit indicate that he has had a long history of neck pain due to being an oral surgeon for 40 years. "November 14 was the first time he woke up with right arm numbness and pain." Id. Petitioner has filed numerous other medical records from later in time, which will not be summarized here.

### b. Affidavits

In support of his allegations, petitioner filed eleven affidavits from himself, his wife, coworkers and patients, and professional colleagues. These affidavits, insofar as they relate to the date of onset, are summarized below.

Petitioner's affidavit provides that onset was on October 2, 2013. He states: "Up until my vaccine injury, I worked as a dental implant surgeon and advanced restorative dentist with only one workday missed since my first day of practice, October 2, 1968. On or about October 2, 2013, I began having severe right hand and right arm muscle pain that was immediately noticeable." Pet. Ex. 29, p. 1. He states that this pain was "deep and consistent" and "occurred numerous times… until November 22, 2013, when I awakened at 2:00 a.m. with right chest, shoulder, arm, hand pain, numbness, and severe weakness, that was completely different than prior occasional discomforts of cervical compression and radiculopathy common to my profession." Id.

Petitioner's wife, Ms. Karen Davis, states that "one night… [petitioner] told me his right hand cramped badly while treating a patient and he had to use his left hand to force the right fingers to open and release the instrument. Pet. Ex. 29, p. 18. Ms. Davis states that this was "around [petitioner's] birthday which is October 10." Id. Soon afterwards, Ms. Davis gained firsthand knowledge of these symptoms. She had previously worked as a dental hygienist in the office, and was the office manager at the time in question. "Within a few days," she personally noticed "procedures taking more time than scheduled, and requiring both his primary and roving assistant to be present chairside." Id.

Petitioner's assistant, Ms. Carol Ghiotto, states that his symptoms began on October 2, 2013. Pet. Ex. 29, p. 15. On that day, she "noticed a change in [petitioner's] hand movements during a treatment with a patient, Arthur Bush." Id.[3] Specifically, Ms. Ghiotto saw that petitioner "could no longer aspirate a syringe while giving the anesthetic injection, as usual." Id. Ms. Ghiotto is "certain these events occurred during the first week of October 2013" because they coincided with petitioner's work anniversary on October 2 and his birthday on October 10. Id.

His second assistant, Ms. Misty Kelleher, states that she noticed in "early October of 2013 [that petitioner] was not able to hold a dental handpiece comfortably the way I knew he could." Pet. Ex. 29, p. 12. Ms. Kelleher also remembers that the cramps "came to his right hand around his birthday." Id.

Petitioner's patient, Mr. Ron Hadley, recounts an "October appointment in 2013" with petitioner. Pet. Ex. 29, p. 16. During that appointment, petitioner "confessed" that he was "having trouble with his hand and arm." Id. Mr. Hadley told petitioner to immediately call his son, Dr. Michael Hadley, about those symptoms. Id. Mr. Hadley returned for another dental appointment in November 2013. Id. At that time, petitioner stated that he would see Dr. Hadley "as soon as he could get some time." Id.[4]

---

[3] Ms. Davis states that "our recent review of the original appointment records retrieved from storage clearly establishes October 2, 2013 as the first occurrence when he was treating Mr. Arthur Bush on October 2, 2013." Pet. Ex. 29, p. 18. During the status conference on October 4, 2016, I ordered petitioner to file copies of these records.

[4] Petitioner first saw Dr. Hadley on December 6, 2013. Ex. 6, p. 1.

Ms. Peggy McLeod states that she was a longtime patient of petitioner and that "late in 2013 (I don't remember the exact date, but it will be in my records)" during an appointment, petitioner "complained about numbness in his fingers and took a break from the procedure." Pet. Ex. 29, p. 13.

Ms. Connie Story also prepared an affidavit. Pet. Ex. 29 at 11. She worked for petitioner until 1999 and was a patient "until his disability occurred in 2013." Id. She does not say anything else about onset. Id.

Dr. Lea Walker, who is petitioner's daughter and a dentist herself, also submitted an affidavit. Dr. Walker states "my dad told me sometime in the fall [of 2013] that he was having significant numbness and pain in his right hand and arm." Pet. Ex. 29, p. 10. Dr. Walker witnessed these symptoms firsthand when she went to him for a filling on December 14, 2013. Id.

Four other affiants state that petitioner told them that his symptoms began in October 2013. Pet. Ex. 29 at 4 (Dr. Jay Shartzer); pp. 5-6 (Dr. Johnny Johnson); p. 7 (Dr. Arthur K. Molzan and Dr. Jay Shartzer); p. 9 (Dr. Harry Plummer). He told them about the symptoms following his hospitalization in January 2013. Id.

IV.    **Parties' Positions**

Respondent states "the contemporaneous treatment records place the onset of petitioner's symptoms on or about November 20, 2013." Resp't's Mot. for Finding of Fact, p. 1.

Petitioner contends that onset was on or about October 2, 2013, when he first experienced severe right hand cramping and pain in his upper arm while treating a patient, Mr. Arthur Bush. Petr's Resp. to Resp't's Mot. for Finding of Fact, p. 1.

V.    **Findings of Fact**

Based on my full review of the medical records and affidavits, I conclude that the date of onset was on or about October 2, 2013.

Contemporaneously created medical records are presumed to be accurate and complete. In this case, the first records of petitioner's symptoms are from November 22, 2013, when he went to the emergency room. Ex. 19, p. 1-17.

However, the presumption that these medical records are accurate and complete is rebuttable. The Court of Federal Claims has specifically recognized that medical records might not be accurate and complete for several reasons. Inconsistencies can be explained by: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. La Londe v. Sec'y of Health & Human Servs., 110 Fed. Cl. 184, 203 (Fed. Cl. 2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014).

In this case, the medical records' accuracy and completeness can be rebutted. Petitioner first sought medical attention on November 22, 2013, when he had chest pains, believed he was having a heart attack, and went to the emergency room. See Ex. 19, p. 1 (medical record summarizing that "patient . . . has been having some problems in through the neck and with pain radiating down the right upper extremity, but yesterday, last night, the pain moved over into the right side of his chest as well . . . and he just became alarmed that it might have been the heart, so he went to the emergency room"). Given that petitioner went to the hospital in the middle of the night after not seeking medical treatment for some time, it is quite likely that he was primarily concerned that he was having a heart attack, and recounted the chest pain with more accuracy and detail than the right hand and right arm pain.

It is also very likely that the medical professionals were more concerned with the chest pain and did not inquire about any history of prior right arm pain. It was clear that they focused on his chest pain, which was listed as the chief complaint. The records reflect that an ECG was done and cardiac enzymes were drawn. These tests are used to detect a myocardial infarction. Although these tests were negative, petitioner was admitted to the hospital for a "cardiac rule out". Dr. Austin dictated at 8:46 AM, "Chest pain. This sounds like this more of a radicular syndrome from his cervical neck arthritis. His first set of cardiac enzymes is negative. His EKG is okay, we are going to go ahead and rule him out for a myocardial infarction." Ex 19, p 2.

The medical professionals also may have associated petitioner's hand and arm pain with his history of cervical disc disease. The emergency room nurse notes this condition at 3:53 a.m., as does Dr. Kaplan at 4:34 a.m. Ex. 19, pp. 10, 15. Dr. Austin, a few hours later, wrote that petitioner had "probable cervical radiculopathy," but Dr. Austin planned to "rule out heart." Pet. Ex. 19, p. 2. These also rebut the presumption that the medical records were accurate and complete with regards to petitioner's hand and neck symptoms.

Further complicating the analysis of onset in this case is petitioner's long history of cervical spine pathology, which apparently had become radiographically worse in and about this time and may also support a diagnosis of radicular pain in the right upper extremity. Apparently, petitioner did not focus on the problems in his right hand and arm for some time. When they persisted, he researched the symptoms, learned about Parsonage-Turner Syndrome, and consulted an expert on that condition, Dr. Feinberg. Dr. Feinberg subsequently examined petitioner and has submitted a report in this case making that diagnosis.

When medical records do not appear accurate and complete, the special master may give greater weight to later oral testimony. To overcome the presumption that written records are accurate, testimony is required to be "consistent, clear, cogent, and compelling." Blutstein v. Sec'y of Health & Human Servs., No. 90-2808v, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). In this case, petitioner has filed several affidavits that satisfy this requirement. Specifically, the affidavits from petitioner himself, his wife, and his two assistants Ms. Ghiotto and Ms. Kelleher all place onset on or about October 2, 2013. Pet. Ex. 29, pp. 1, 12, 15, 18. These affidavits are persuasive because they connect the date of onset to other specific dates in petitioner's life. Petitioner, his wife, Ms. Ghiotto, and Ms. Kelleher all remember the symptoms beginning around the time of his work anniversary on October 2 and/ or his birthday on October 10. Id. Ms. Ghiotto also states that she observed when petitioner first had trouble with his right hand, while treating a

specific patient, Mr. Arthur Bush. Pet. Ex. 29, p. 15. The dental practice's records confirm that Mr. Bush was seen on October 2, 2013. Petitioner's wife and the two assistants support his account that the symptoms beginning on or about October 2, 2013 were new and different from the previous symptoms that were secondary to his cervical disc disease and foraminal stenosis, which he attributed to long years of dental practice.

Mr. Ron Hadley's affidavit also has some persuasive value. First, Mr. Hadley stated that he discussed the hand and arm issues with petitioner during an "October appointment in 2013." Pet. Ex. 29, p. 16. He does not give an exact date in October. However, he states that he was a longtime patient of petitioner, was concerned about him, and wanted petitioner to seek treatment by his son Dr. Michael Hadley. Id. When Mr. Hadley returned in November 2013, he learned that petitioner was still experiencing symptoms, had not sought medical attention for his hand and arm, and was waiting until he "had the time." Id. This account suggests that Mr. Hadley, as well, was aware of petitioner's condition for some time before the emergency room visit on November 22, 2013. Id. It also establishes that petitioner was made aware of Dr. Hadley - a physician with specific expertise with hand and arm issues – but did not immediately seek an appointment with him. Id. The other affidavits filed are less relevant to the issue of onset, because they are less specific or they are not based on firsthand knowledge, but rather, on subsequent conversations with petitioner.

## VI. Conclusion

Based on a review of the medical records, and the affidavits referenced above, I conclude that onset of petitioner's symptoms was likely on or about October 2, 2013. The parties are ordered to provide these Findings of Fact to any expert whom they may retain to offer an opinion in this case. An expert's assumption of any fact that is inconsistent with these Findings of Fact will not be credited. Burns v. Sec'y of Health & Human Servs., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that the special master properly rejected an expert's opinion because it was based on facts not substantiated by the record).This opinion does not foreclose the respondent's right to dispute the diagnosis proffered in this case based upon the medical records, but merely requires the acceptance of the onset of the right extremity condition described in the affidavits as being at the beginning of October 2013.

Respondent shall file her Rule 4(c) report and her expert report within sixty days, no later than **Wednesday, December 7, 2016**.

Any questions regarding this order may be directed to my law clerk, Hilary Johnson, at (202) 357 6361 or hilary_johnson@cfc.uscourts.gov.

**IT IS SO ORDERED.**

                                            **s/ Thomas L. Gowen**
                                            Thomas L. Gowen
                                            Special Master