# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
Filed: December 21, 2023

| | | |
|---|---|---|
| * * * * * * * * * * * * | | PUBLISHED |
| MARK V. DAVIS, | * | |
| | * | No. 16-276V |
| Petitioner, | * | |
| | * | Special Master Gowen |
| v. | * | |
| | * | |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| * * * * * * * * * * * * | | |

*Michael P. Milmoe*, Law Offices of Leah V. Durant, LLC, Washington, D.C., for petitioner
*Julia M. Collison*, United States Department of Justice, Washington, D.C., for respondent.

## DECISION ON DAMAGES[1]

A damages hearing was held in the above-captioned matter on October 30, 2023. At the conclusion of the hearing, the undersigned issued a ruling from the bench resolving all categories of damages and awarding petitioner $1,036,017.00 in past lost wages and $250,000.00 in pain and suffering. Transcript ("Tr.") at 120, 122 (ECF No. 166). This opinion memorializes and provides further explanation for such decision.

### I. Procedural and Factual History

The Ruling on Entitlement provides a thorough procedural history leading up to the entitlement hearing, held on January 17 and 18, 2019. *Davis v. Sec'y of Health & Human Servs.*, No. 16-276V, 2021 WL 3910609, at *2–3 (Fed. Cl. Spec. Mstr. Dec. July 23, 2021). It also provides a thorough factual history and summary of the evidence submitted during the Entitlement phase of this case. *Id.* at *28-29. Both histories are incorporated fully herewith and will not be repeated. Following the hearing, the parties engaged in settlement negotiations, but eventually reached an impasse, and requested that the case be referred to mediation. Joint Status Report at 1 (ECF No. 84); Joint Status Report at 1 (ECF No. 87); Order Referring Case to ADR (ECF No. 88). After an unsuccessful mediation on November 19, 2019, the parties requested that the case be placed back in litigation, and both parties filed post-hearing briefs. Joint Status

---

[1] Because this decision contains a reasoned explanation for the undersigned's action in this case, the undersigned intends to post this decision on the website of the United States Court of Federal Claims, with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). As provided by Vaccine Rule 18(b), each party has 14 days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that include medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18 (b).

Report at 1 (ECF No. 90); Pet. Post-Hearing Brief (ECF No. 101); Resp. Post-Hearing Brief (ECF No. 103).

A Ruling on Entitlement finding that petitioner was entitled to compensation was issued on July 23, 2021. *Davis*, 2021 WL at *28-29. In that ruling, I found that petitioner's brachial neuritis was caused by the tetanus-diphtheria vaccine administered to him on September 20, 2013, and that his compensable injuries are limited to the upper extremity nerve plexus injuries to the interosseous nerve and the long thoracic nerve. *Id.* Thereafter, the parties re-engaged in settlement negotiations but were unable to resolve the case informally. *See* Joint Status Report at 1 (ECF No. 120). Petitioner filed his damages brief on August 1, 2022, and respondent filed a responsive damages brief on November 15, 2022. Pet. Damages Brief (ECF No. 129); Resp. Damages Brief (ECF No. 134). Petitioner filed a reply brief on March 23, 2023. Pet. Reply Brief on Damages (ECF No. 141).

Both parties filed multiple economic expert reports on the issue of lost wages. Respondent submitted reports from Patrick Kennedy, Ph.D. on November 15, 2022, July 18, 2023, and October 27, 2023. Respondent's Exhibit ("Resp. Ex.") K (ECF No. 135); Resp. Ex. L (ECF No. 153); Resp. Ex. M (ECF No.161). Petitioner submitted reports from Robert Cook, Ph.D. on March 23, 2023, July 3, 2023, and October 13, 2023. Pet. Ex. 66 (ECF No. 140); Pet. Ex. 76 (ECF No. 150); Pet. Ex. 80 (ECF No. 157). After the initial expert reports were filed, a recorded telephonic status conference was held on August 1, 2023, with the parties and both economist experts participating. *See* Hearing Order (ECF No. 154). A damages hearing was held on October 30, 2023, and I issued a bench ruling on damages at the conclusion of the proceedings, awarding petitioner $1,039,017.00 in past lost wages and $250,000.00 in past pain and suffering. Tr. at 119–22. Additional facts particularly relevant to the damages issues are included in the discussion below.

## II. Discussion

### A. Lost Wages

The Vaccine Act provides that compensation for loss of earnings, including actual loss of earnings, should be "determined in accordance with generally recognized actuarial principles and projections." 42 U.S.C. § 300aa–15(a)(3)(A). While the Federal Circuit has not interpreted what qualifies as "generally recognized actuarial principles and projections," the Court of Federal Claims has recognized in the broader context that "the determination of compensation for lost earnings . . . would likely require expert opinion evidence." *Dillenbeck v. Sec'y of Health & Human Servs.*, 147 Fed. Cl. 131, 139 (2020).

Both parties submitted multiple expert reports from economists on the issue of lost wages. The economists disagreed on petitioner's work-life expectancy, the wage base used to calculate lost wages, and whether to include the $65,067.00 capital loss from the sale of petitioner's dental practice in lost earnings.

### i. Wage Base

Petitioner's expert, Dr. Cook, utilized wage data from petitioner's dental practice from 2006 – 2013 to calculate a base income of $196,704.00 per year. Respondent's expert, Dr. Kennedy, utilized wage data from petitioner's dental practice from 2009 – 2013 to calculate a base income of $139,692.00 per year. As noted in a prior Order, petitioner's income from his dental practice was significantly higher from 2006 – 2008. Scheduling Order at 4 (ECF No. 146). There was no additional testimony from petitioner as to why his income was higher during these years such that the higher income from the earlier years should be considered in his base income. As such, I conclude that Dr. Kennedy's base income of $139,692.00 per year based on petitioner's income in the five years preceding his vaccination is the appropriate wage base to calculate past lost wages, as it reflects a sufficient period of time and the most recent period of petitioner's career. It is the wage base I used in awarding petitioner $1,036,017.00 in lost wages. Tr. at 120.

### ii. Work-life Expectancy

As to petitioner's work-life expectancy, Dr. Cook opined that petitioner would have worked until age 80. Pet. Ex. 66 at 6. Though Dr. Cook admits that "the generally accepted methodology . . . is to calculate future lost wages using a claimant's statistical work life," he notes that there are exceptions to this rule "such as when a claimant has already worked past his typical statistical work life." *Id.* at 7. Dr. Cook noted that petitioner had worked past the typical statistical work life for dentists, and provided statistical support indicating that dentists working past their typical work life expectancy are likely to work "many more years than the mean." *Id.* Using these statistics, and "the multiple testaments to [petitioner's] ability and intent to work until age 80 and beyond," Dr. Cook calculated lost wages until petitioner's 80th birthday. *Id.* at 7-8. Dr. Kennedy disagreed with this approach, and calculated petitioner's statistical work life expectancy to age 76.80. Resp. Ex. K at 3. After a preliminary indication that petitioner's intent to continue working beyond the statistical work life expectancy was reasonable, I requested that Dr. Kennedy provide an additional wage loss calculation to petitioner's age 80. Scheduling Order at 4 (ECF No. 146). Dr. Kennedy provided such calculation in a supplemental report, opining that petitioner's lost wages to age 80 were $1,036,017.00 Resp. Ex. L at 1.

I found credible Dr. Davis's testimony that he intended to continue working for the rest of his life. *See* Tr. at 17. He explained the specialized skill required for dental implant surgery which he had developed and provided affidavits from colleagues in the field indicating his likely longevity in dental practice. *See* Tr. at 20-21. Based on petitioner's testimony at both the entitlement hearing and damages hearing, petitioner's medical records prior to the vaccination supporting his ability and intent to practice dentistry for as long as he could, and affidavits from the petitioner, petitioner's primary care physician, and a colleague all attesting to petitioner's intent to work for as long as possible, I determined that petitioner likely would have worked until his 80th birthday absent the vaccine injury. *Id.* at 120.

At the hearing, respondent's counsel attempted to establish that petitioner's retirement was related to a myocardial infarction he suffered in 2013 and ongoing congestive heart failure, as opposed to his vaccine injury. *See id.* at 80-81. However, petitioner testified that he made a

full recovery from the myocardial infarction within approximately six months to a year. *Id.* at 61. Petitioner also submitted letters from his family doctor, Thomas Austin, M.D. and his cardiologist Bernardo Stein, M.D. attesting to his fitness to continue in dentistry. Pet. Ex. 63; Pet. Ex. 68. Dr. Stein explained that petitioner had suffered a serious myocardial infarction with a 100% occlusion of the left descending coronary artery, but that he had been aggressively treated and had a good recovery within a matter of a few months. Pet. Ex. 63 at 1. Based on petitioner's testimony about his recovery from the myocardial infarction and the explanation from his physicians, it is reasonable to conclude that his cardiac event did not affect his ability to practice dentistry and that, consistent with his testimony, he would have continued working absent his vaccine-related brachial neuritis.

### iii. Interest on Business Loans

In his written commentary following the recorded status conference on August 1, 2023, Dr. Cook, for the first time, raised an additional issue regarding petitioner's lost wages. Dr. Cook opined that an average of approximately $32,000.00 in interest payments on the outstanding business loan from 2009-2013 should be added back into petitioner's wage base because the loans were repaid in 2016.[2] Pet. Ex. 80 at 1; Pet. Ex. 81 at 1. The essence of Dr. Cook's argument was that, but for the ongoing payments on business debt during the years used to calculate petitioner's wage base, petitioner's income would have been approximately $32,000.00 higher per year. Pet. Ex. 80 at 1. Thus, Dr. Cook suggested that, using the interest payment data, petitioner's income would have been higher in the years following the payoff of the loans. *Id.*

Petitioner testified that he opened a new dental practice in 2006, which cost a total of $950,000.00. Tr. at 10. The cost was financed through three loans for $500,000.00, $180,000.00, and $140,000.00, and through his personal investments. *Id.* According to the testimony at the hearing, at the time of petitioner's injury, the two smaller loans were satisfied, and he was making payments only on the $500,000.00 loan. *Id.* at 105. Respondent, using a printout of the amortization of the outstanding loan with Nicolet Bank, established that petitioner's interest payments on that loan in 2013 and 2014 were $7,245.38 and $7,406.24 respectively. *See id.* at 103-04; Pet. Ex. 58 at 162-65. Respondent also established that petitioner paid off the remaining $123,358.87 balance on the loan when he sold his dental practice in 2014. Tr. at 103-04. This was consistent with the testimony of petitioner and petitioner's wife at the hearing. Tr. 10-11, 102-03, 118. Petitioner testified that he would have continued making the monthly loan payments, including the interest payment, had the loan not been paid off at the time of the sale of the business. *Id.* at 104.

In response to Dr. Cook's opinion that the interest payment should be added back into petitioner's income, Dr. Kennedy, stated that the "interest expense was a normal, monthly cost of operating [petitioner's] business." Resp. Ex. M at 2. Dr. Kennedy also highlighted the fact that petitioner "re-negotiated his debt in 2011 as part of his 10-year business plan which indicates he

---

[2] It appears that this reference was in error as at least the loan about which testimony was presented was paid off at the time of the sale of the business in 2014. However, at the post-hearing status conference, petitioner's accountant, Mark Bryant, CPA, and respondent's economic expert, Dr. Kennedy both opined that the loan would have been paid off in 2016 absent the 2014 sale of the dental practice, though they differed as to the exact month. *See* discussion *infra* p. 5.

was likely to continue [the interest] expense." *Id.* at 3. I announced at the conclusion of the hearing that I was not allowing the interest payments on the business loan to be added back to the income figures since petitioner would not have paid off the loan in 2014 but-for his vaccine injury. Tr. at 121.

Weeks after the conclusion of the hearing, petitioner filed a letter from his accountant, Robert Bryant, CPA, attempting to explain the varying interest payment numbers that appeared in petitioner's tax returns and arguing that the actual interest payments in 2013 and 2014 were higher than the approximately $7,000.00 reflected on the loan amortization document. *See* Pet. Ex. 89 (ECF No. 163). Respondent argued that a decision on damages was made at the conclusion of the hearing, and, therefore, the letter should not be considered. Resp. Status Report at 1 (ECF No. 164). Petitioner argued that the evidentiary record was not yet closed, as a written decision on damages had not yet been issued. Pet. Status Report at 1 (ECF No. 167). Petitioner requested that I consider the letter from the accountant in calculating petitioner's lost wages. *Id.* Although I indeed closed the record at the conclusion of the hearing, I held a recorded status conference on December 14, 2023 to hear the parties' arguments on this issue. *See* Tr. at 123 ("with that, we can close the record"); Status Conference Order (ECF No. 168).

In addition to counsel for both parties, petitioner's accountant, Mr. Bryant, and respondent's economic expert, Dr. Kennedy, were present for the status conference. Mr. Bryant explained that, after filing petitioner's 2012 tax returns, he discovered that the $17,565.00 interest deduction claimed therein was erroneous because the entire loan payment was applied to the principal balance by mistake. *See* Pet. Ex. 56 at 48. Mr. Bryant further explained that, at the time, he recalculated the interest that should have been deducted on the 2012 return and apparently added it to the interest for 2013, leading to the $46,634.00 of interest payments claimed in 2013. *See id.* at 49. The ensuing discussion revealed that petitioner apparently had a revolving business credit account at Wells Fargo and a car loan, with the interest on these also included in Mr. Bryant's interest calculation.[3] Mr. Bryant correctly indicated that the Nicolet loan documentation reflected payment beginning in April of 2013 and did not include whatever payments were made on such loan in the first quarter of the year. Pet. Ex. 58 at 164. He suggested that inclusion of the payments for the first quarter of 2013 would have somehow increased the interest payment to about $28,000.00 for the year.[4]

Dr. Kennedy tracked the loan balances through the underlying loan documents, which suggested that there was more than one loan outstanding. He also argued that, based on the history of financing for petitioner's dental practice, it is likely that additional financing would have occurred. Mr. Bryant observed that petitioner was paying an additional $250.00 a month toward principal in order to reduce the Nicolet loan balance more quickly which, absent the 2014 sale of the business, would likely have been eliminated in 2016.

---

[3] This was the first reference to a Wells Fargo line of credit throughout the entirety of this case. Petitioner filed no documentation of such account.

[4] According to Mr. Bryant, he was unable to obtain further documentation of the loan payments from Nicolet which, at some point, merged with another bank and apparently no longer maintained the older files. There was no indication of an effort to document the history of the revolving credit line.

While I can understand the argument that, if the loan payments were indeed eliminated in 2016 and Dr. Davis continued to practice past such time, the result would be a higher net income for him, the evidence supporting such argument is too speculative to accurately quantify the increase in net income. The evidence as to the rather complex maze of information regarding the loans and loan payments is entirely too uncertain given the combination of loans with a balloon payment, restructuring of the debt, revolving credit, loans that did not amortize on a straight-line schedule, and other problems. If petitioner wanted to assert a serious claim for interest add back to his income for the time after the loans were paid off, he should have prepared and presented a detailed explanation at the time of the hearing. Even at the time of the post hearing status conference, Mr. Bryant was not able to specifically quantify the amount of interest payments or even the total loan payments on apparently more than one account to support a claim for an interest add back exceeding the approximately $7,000.00 figure documented in the Nicolet amortization printout. *See* Pet. Ex. 58 at 161-65. Furthermore, based on the evidence before me, the larger interest payments made in the 2009-2012 period, assuming they were accurately reflected on the tax returns, had reduced to approximately $7,000.00, suggesting that the proposed add back was substantially reflected in the income numbers for the last two years in petitioner's practice. Thus, the $7,000.00 in interest payments was already factored into my wage loss award announced at the conclusion of the hearing, as previously explained herein.

Accordingly, I conclude that there is not sufficient reason to re-open the evidentiary record. Petitioner had the opportunity at the damages hearing held on October 30, 2023 to offer specific evidence to explain and substantiate any increase in wage base based on the payoff of outstanding loans, but such evidence was not presented. The evidence adduced during the post hearing status conference is insufficient to substantiate an add back to income based on the potential payoff of the loan or loans or to justify any further evidentiary proceedings.

### iv.  Effect of Sale of Dental Practice on Lost Wages

Petitioner, no longer able to practice dentistry due to his injury, sold his dental practice for $400,000.00 in 2014. Pet. Ex. 85 at 4. Of the total purchase price, $300,000.00 was allocated to goodwill, $5,000.00 was allocated to supplies, and $95,000.00 was allocated to "dental equipment, office furniture, equipment, and trade fixtures." *Id.* Petitioner claimed a $65,067.00 capital loss on his 2014 taxes related to the sale of equipment and deducted such loss from his income. *Id.* at 168, 175. He also reported a capital gain of $259,805.00 from the sale of the business. *Id.* at 168, 221.

Petitioner's expert, Dr. Cook, opined that the capital loss should be included in petitioner's lost earnings. Pet. Ex. 66 at 6. Dr. Cook reasoned that "the sale of the property in 2014 was the sole function of the vaccine injury and absent the vaccine injury would have occurred in 2022." Pet. Ex. 80 at 1. According to Dr. Cook, there would have been no capital loss in 2022 because the equipment would have been fully depreciated by that time. *Id.*

Dr. Kennedy disagreed with this analysis, observing that petitioner "received the proceeds from the sale of the business in 2014, approximately 8 years sooner than he would have but-for the incident." Moreover, Dr. Kennedy highlighted the fact that the $65,067.00 capital loss reduced petitioner's income tax liability in 2014. *Id.*

Dr. Kennedy also opined that any interest earned on investment of the net proceeds of the sale would need to be reduced from Petitioner's lost wages. *Id.* When asked what happened to the net proceeds from the sale, petitioner stated that $123,000.00 went towards paying off the outstanding business loan, and the remainder was likely put in a non-interest-bearing account. Tr. at 96-97. Mrs. Davis testified that she believed the funds were put in a minimal interest-bearing account. *Id.* at 109. Regardless of whether the account was non-interest-bearing or was a minimal interest-bearing savings account, there is no reduction in lost wages from interest made on the net proceeds from the sale of the dental practice. A review of later year tax returns shows an essentially de-minimis amount of interest earned of approximately $150.00 a year. *See, e.g.*, Pet. Ex. 79 at 4. Thus, while there does appear to be investment income, it is not clear whether that arose from the proceeds of the sale or from his retirement account.

Dr. Kennedy's approach to the capital loss is the proper method for "actual lost wages." Dr. Cook postulated that, had Dr. Davis continued to practice through the year 2022, the equipment would have been fully depreciated and had no value, thus the pre-mature sale in 2014 caused the loss of $65,067.00. While the tax code allows the depreciation of business equipment on varying schedules, it seems unlikely that the equipment and leasehold improvements would have had no value on the resale market at the time that it was fully depreciated. What it's value would have been is speculative. Furthermore, Dr. Cook set forth a formula for capital loss: "the sum of the sales price and depreciation minus the acquisition cost." Pet. Ex. 80 at 1. Though there was testimony about the original loans which financed the purchase of the equipment, no evidence was presented as to the actual acquisition cost of the equipment and improvements being depreciated or about depreciation schedule on such equipment.

If petitioner expected to be compensated for this capital loss, consistent with his burden of proof, he should have presented evidence explaining all of the above at the hearing. He did not, and I do not see any reason to re-open the evidence based on what has now been submitted.

For these reasons, I accept Dr. Kennedy's opinion that petitioner's lost wages are $1,036,017.00, using a wage base of $139,692.00 per year and a work life expectancy until petitioner's 80th birthday. This amount does not include the $65,067.00 capital loss on the sale of equipment, an add-back from petitioner's payoff of the business loan, or a reduction from any interest earned on the investment of the net proceeds from the sale of the dental practice. Because petitioner was 81 years old at the time of the damages hearing, all lost wages are awarded as past lost wages.

### B. Pain and Suffering

The Vaccine Act provides that a petitioner may recover "for actual and projected pain and suffering and emotional distress from the vaccine-related injury an award not to exceed $250,000." 42 U.S.C. § 300aa–15(a)(4). There is no mathematical formula for assigning a monetary value to a person's pain and suffering. *I.D. v. Sec'y of Health & Human Servs*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. Dec. April 19, 2013). A "continuum of injury" approach to pain and suffering damages, where the cap was reserved for the most severe injuries and lower awards were made for less severe injuries, was created with a goal "to fairly

treat all petitioners." *Hocraffer v. Sec'y of Health Human Servs.*, No. 99-533V, 2007 WL *914914, at *5 (Fed. Cl. Spec. Mstr. Feb. 28, 2007). However, the Court of Federal Claims later determined that this the "continuum" approach was not "rooted in statute or precedent." *Graves v. Sec'y of Health and Human Servs.,* 109 Fed. Cl. 579, 590 (2013).

In *Graves*, the Court set forth a different approach in which the first step is to assess an individual petitioner's pain and suffering by looking to the evidence on the record, without regard to the $250,000 cap. *Id.* at 589-90 Only then as a second step, if the award would exceed $250,000, must it be reduced to that maximum. *See id.* Though not binding on special masters, the *Graves* approach has been found to be persuasive, and is now the prevailing approach used. *See, e.g.*, *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *10 (Fed. Cl. Spec. Mstr. Moran April 19, 2013) ("Under the interpretation of the statute offered in *Graves*, cases that used the spectrum approach, such as *Hocraffer* and *Long*, are no longer useful measuring points"); *Reed v. Sec'y of Health & Human Servs.*, No. 16.1670V, 2019 WL 1222925, at *12 (Fed. Cl. Chief Spec. Mstr. Dorsey Feb. 1, 2019) ("it must be stressed that pain and suffering is not based on a continuum"); *Selling v. Sec'y of Health & Human Servs.*, No. 16-588V, 2019 WL 3425224, at *5 (Fed. Cl. Spec. Mstr. Oler May 2, 2019) ("Pain and suffering is not, however, determined based on a continuum"); *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428V, 2019 WL 4072069, at *13 (Fed. Cl. Spec. Mstr. Corcoran July 29, 2019) ("… special masters appear to have accepted *Graves*'s methodology since issuance of that decision… I will apply it herein as well, although I do so mindful of the need to consider the overall strength of petitioner's showing herein"), *rev'd and remanded on other grounds*, 147 Fed. Cl. 131 (2020); *W.B. v. Sec'y of Health & Human Servs.*, No. 18-1364V, 2020 WL 5509686, at *3 (Fed. Cl. Chief Spec. Mstr. Corcoran Aug. 7, 2020) ("it must be stressed that pain and suffering is not based on a continuum").

In assessing the entire record in awarding damages for pain and suffering, factors to consider include "(1) the ability to understand the injury . . . (2) the degree of severity of the injury; and (3) the potential number of years the individual is subjected to the injury." *I.D.*, 2013 WL 2448125 at *9 (internal citations omitted). I find it appropriate to also consider any impairments in function and/or lost ability to participate in activities which the petitioner previously enjoyed, as a result of the injury.

There is nothing diminishing petitioner's ability to understand his injury. He has been acutely aware of the pain in his right hand and arm since its onset in 2013. Petitioner testified to his awareness of the pain, and how he must consciously adjust the way he accomplishes basic tasks to account for the decreased function in his right hand. Tr. at 43, 51–52. Petitioner is also aware of the permanent nature of his injury. Petitioner testified that he understood that the vast majority of people with brachial neuritis recover in two to three years. *Id.* at 62. Though he spent the first few years with his condition hopeful for a full recovery, he now understands that his condition is permanent and is unlikely to improve. *Id.*

The permanent nature of petitioner's injury is also relevant to third *Graves* consideration. At the time of the hearing, petitioner had suffered from pain and decreased function in his dominant, right hand for about ten years. *Id.* at 45. Petitioner testified that he has experienced daily pain since the onset of his brachial neuritis. *Id.* Petitioner's symptoms have now persisted

for three times the number of years it takes most brachial neuritis patients to fully recover from the condition, and I concluded at the hearing that his injury is permanent. *Id.* at 122.

Petitioner also established the severe nature of his injury. In his testimony, he explained that most of his pain is in the area of his right deltoid muscle. *Id.* at 44. He also testified that he struggles with fine motor control of his right hand. *Id.* at 46. His daily pain level ranges from approximately 2 to 6 out of 10. *Id.* at 41. He takes ibuprofen multiple times per day to treat the pain, but it is not fully effective. *Id.* at 8. Many of petitioner's daily activities are affected by his ongoing pain. *See e.g., id.* at 47-48. This testimony, along with petitioner's medical records establish the severe nature of his injury.

Finally, petitioner testified that his injury "turned [his] life upside down." *Id.* at 39. The majority of petitioner's social activities revolved around his work as a dentist. Petitioner testified that "most of the things I was really attached to, that I gained great joy from are no longer possible. And so I have lost the collegial friendship contacts from the people that were in a similar position all over the country. Our friendships were very much tied up with the work that we did. We miss the interaction with patients." *Id.* at 39. He also testified that his injury upended his life by ending his career as a dentist, causing him to withdraw socially, and putting financial strain on his family. *Id.* at 41. Petitioner's wife reiterated these points, testifying that dentistry "was everything" for them. *Id.* at 116. Petitioner has clearly lost the ability to do something he once enjoyed as a result of his injury. In consideration of petitioner's awareness of his injury, the 10 years that he has experienced pain, the severity of his injury, his loss of function, and his inability to practice dentistry, along with the attendant psychological pain that has caused, I award petitioner $250,000.00 in past pain and suffering. *Id.* at 122.

### III.     Conclusion

Based on the record as a whole and the testimony heard at the October 30, 2023 hearing, I award petitioner a lump sum payment of **$1,286,017.00, representing $1,036,017.00 in past lost wages and $250,000.00 in past pain and suffering. This amount represents compensation for all damages available under § 300aa-15(a).**

**The Clerk of the Court is directed to enter judgment in accordance with this decision.**

**IT IS SO ORDERED.**

**s/ Thomas L. Gowen**
Thomas L. Gowen
Special Master

9